IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRIAN D. WHITMORE, | : | CIVIL ACTION |
| | : | NO. 18-4447 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NATIONAL RAILROAD PASSENGER | : | |
| CORPORATION, | : | |
| | : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                    December 30, 2020

## I.    INTRODUCTION

Brian Whitmore brings this employment discrimination action against National Railroad Passenger Corporation ("Amtrak"). Whitmore alleges Amtrak violated 42 U.S.C. § 1981, Title VII of the Civil Rights Act, and the Pennsylvania Human Relations Act by discriminating against him because he is African American, subjecting him to a hostile work environment, and retaliating against him.

Amtrak moves for summary judgment on all claims. For the reasons set forth below, the Court will: (1) deny the motion with respect to the race discrimination claims and (2) grant the motion with respect to the hostile work environment and retaliation claims.

## II.   **BACKGROUND**[1]

Amtrak hired Whitmore as a trackman in 1999. In 2004, Whitmore began a track maintenance position working on Engineer and Work Equipment ("EWE") machinery. In that role, he operated various machines for track maintenance gangs.

Between June 2015 and September 2017, Whitmore held two training positions with Amtrak: one on equipment known as the transport wagon, and one on the "PK1" crane. He alleges Amtrak "deprived him of career advancement when he was forced to forfeit these positions as a result of Amtrak's purposely refusing to train him due to his race." Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 1, ECF No. 46.

### A.   Training Position 1: Transport Wagon

In June 2015, Whitmore began a transport wagon training position with the Switch Exchange Systems ("SES") work gang, which repairs rail switches. A transport wagon is used to install cross-over switches that enable a train to move from one track to another. Whitmore's supervisor in the SES division was Timothy McFarland, who is white. According to Whitmore,

---

[1]     Because Whitmore did not file a separate statement of facts in numbered paragraphs, the facts in this Section are drawn from Amtrak's Separate Statement of Undisputed Material Facts and the facts stated in Whitmore's Memorandum of Law in Opposition to Amtrak's Motion for Summary Judgment. See Def.'s Statement Undisputed Material Facts, ECF No. 43-2; Pl.'s Br. Opp'n Def.'s Mot. Summ. J., ECF No. 46. As required at the summary judgment stage, the Court views these facts "in the light most favorable" to the nonmoving party and draws "all reasonable inferences" in that party's favor. Young v. Martin, 801 F.3d 172, 174 (3d Cir. 2015).

McFarland controlled all aspects of the division, including who received training. McFarland reported to Anthony Civil, the Manager of Engineering Production, who is African American.

Whitmore's trainee position required him to become qualified on the transport wagon to stay in the role. A machine operator can qualify by completing training with an assigned trainer and then taking a test, or "demonstration," to show proficiency. An operator who has not held a training position can qualify for a position by requesting to demonstrate his qualifications via a qualification exam at any time. An employee who wants to become qualified on a piece of equipment must submit a written Request to Demonstrate and receive clearance to take the test.

Trainers are assigned by Whitmore's union, the Brotherhood of Maintenance Way Employees (BMWE), a division of the International Brotherhood of Teamsters. The BMWE initially assigned Roy Wilkins, who is Black, to train Whitmore. Wilkins evaluated Whitmore's qualification on the transport wagon in December 2015 and determined that Whitmore failed to qualify. Amtrak then notified Whitmore that he needed to vacate his trainee position, but it subsequently rescinded that decision and permitted Whitmore to remain in the role.

In December 2015, after learning Wilkins had failed to qualify him on the transport wagon, Whitmore contacted the

3

Amtrak Helpline and claimed that Wilkins "has not liked him and has been harassing him since he came into the group," and that Wilkins "told another employee . . . that Whitmore is never going to be qualified because [Wilkins] is not going to train him." Whitmore Dep. 143:19-145:9, ECF No. 46-3.

Whitmore lodged a second Helpline complaint later that month, alleging Wilkins approached him while Whitmore was training on a machine and forbade him from doing so. Whitmore reported that Wilkins is Jamaican, and that Whitmore believed Wilkins was discriminating against him because of his national origin.

Whitmore made a third Helpline complaint in April 2016 in which he described approaching McFarland, his supervisor, as McFarland was sitting in a vehicle and asking why he had been denied overtime. Whitmore testified that McFarland attempted to close the car window on his hand, and that McFarland swore at him, told him to "get a lawyer," and said he did not want to talk to Whitmore because Whitmore was "making phone calls outside the game." Id. at 110:17-22. Amtrak investigated Whitmore's claims and found them to be unsubstantiated.

In May 2016, John Cannon, who is white, became Whitmore's trainer. Whitmore contends that Cannon made no attempt to train him on the transport wagon, and that McFarland refused to intervene to assist Whitmore.

4

In January 2017, Training Department Management Lead Frank Kruse, who is of American Indian and Alaska Native descent, discussed Whitmore's training with Cannon, Civil, and McFarland. Cannon and McFarland told Kruse that Whitmore had not cooperated with efforts to train him.

In March, Kruse informed Whitmore that Amtrak was removing him from the transport wagon position because he had failed to complete his training. Whitmore subsequently moved to a rail heater position in another unit.

### B.   Training Position 2: PK1 Crane

In May 2017, Whitmore bid into another training position on the SES gang, this time for the EWE "A" Port Crane ("PK1"). The PK1 crane sits atop the transport wagon. The crane's operator moves it off the wagon and uses it to lift switch panels. McFarland was Whitmore's supervisor at this time, and Cannon was assigned as Whitmore's trainer on the PK1 crane.

Shortly after Whitmore bid into the position, the gang was assigned to a large project in Penn Station. Because the gang was working in a restricted space, employees did much of the work manually and did not regularly use the PK1 crane on the project.

Whitmore made two Helpline complaints in the summer of 2017, alleging that Civil, the Manager of Engineering Production, was harassing him by accusing him of not doing his

work. He complained that Civil was retaliating against him for his past Helpline complaints. Amtrak investigated the claims and determined they were unfounded.

On August 14, 2017, Whitmore filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging race discrimination and retaliation. He alleged that Cannon refused to train him in retaliation for the prior race discrimination complaints he had lodged, and that he was removed from the transport wagon training position, also for that reason.

On September 7, 2017, Cannon told Civil that Whitmore had refused to train with him. On September 11, Cannon brought Whitmore to the PK1 crane and asked him to identify the parts of the machine. Whitmore responded that Cannon was setting him up for failure, and he did not comply. Also on that date, Civil eliminated Whitmore's training position based on Whitmore's reported failure to commit to training. Civil also eliminated the position of another trainee, who is Hispanic, for the same reason.

The next day, Whitmore made another Helpline complaint, claiming that his training position was abolished in retaliation for his having complained about an alleged lack of training. He subsequently bid into a rail heater position.

In April of 2018, Whitmore contacted Amtrak's Director of Engineering Training and Development, Steven Ladislaw, and said that his training positions had been abolished after Cannon refused to train him. Whitmore told Ladislaw that he had been scheduled to demonstrate his proficiency on the transport wagon on three separate occasions, but that McFarland or Cannon cancelled each time. Whitmore reported that McFarland and Cannon had qualified a white employee, Mark Griffin, on equipment even though Griffin had not been trained. Griffin was qualified on the PK2 crane, which is similar to the PK1 crane to which Whitmore was assigned but is stationary and easier to operate. According to Whitmore, Ladislaw did not intervene to assist him.

In the instant action, Whitmore alleges Amtrak denied him training to which he was entitled because of his race.[2] He also alleges he was subject to a hostile work environment, and that Amtrak retaliated against him for making complaints to the Amtrak Helpline and filing an EEOC charge. Amtrak's motion for summary judgment on all claims is presently before the Court.

## III. LEGAL STANDARD

Summary judgment is "appropriate only when 'there is no genuine dispute as to any material fact and the movant is

---

[2]     Whitmore's Second Amended Complaint also named his union, the Brotherhood of Maintenance Way Employees, as a defendant. The Court subsequently granted the union's motion to dismiss the claims against it. See Order, Aug. 19, 2019, ECF No. 38.

entitled to judgment as a matter of law.'" Physicians
Healthsource, Inc. v. Cephalon, Inc., 954 F.3d 615, 618 (3d Cir.
2020) (quoting Fed. R. Civ. P. 56(a)). A fact is material "if it
'might affect the outcome of the suit under the governing law.'"
Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986)). A factual dispute is genuine "if the 'evidence is such
that a reasonable jury could return a verdict for the nonmoving
party.'" Id. (quoting Anderson, 477 U.S. at 248).

The moving party bears the initial burden of showing the
absence of a genuine issue of material fact. If the movant meets
this obligation, the nonmoving party must "set forth specific
facts showing that there is a genuine issue for trial."
Anderson, 477 U.S. at 250. At the summary judgment stage, the
Court must view the facts "in the light most favorable to" the
nonmoving party and "draw all reasonable inferences in favor" of
that party. Young v. Martin, 801 F.3d 172, 174 (3d Cir. 2015).

## IV. DISCUSSION

### A. Railway Labor Act Preemption

As a threshold matter, Amtrak argues the Railway Labor Act
(RLA), 45 U.S.C. § 151 et seq., preempts Whitmore's
discrimination and retaliation claims. Congress enacted the RLA
"to promote stability in labor-management relations by providing
a comprehensive framework for resolving labor disputes."
Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 252 (1994)

(citing Atchison, T. & S.F.R. Co. v. Buell, 480 U.S. 557, 562
(1987)). To that end, the RLA "establishes a mandatory arbitral
mechanism" for, inter alia, "the prompt and orderly settlement"
of "controversies over the meaning of an existing collective
bargaining agreement ["CBA"] in a particular fact
situation." Id. (first quoting 45 U.S.C. § 151a; then quoting
Brotherhood of R.R. Trainmen v. Chi. River & Ind. R.R. Co., 353
U.S. 30, 33 (1957)). "[T]he RLA precludes a claim if it 'depends
on an interpretation of the CBA,' but not 'if it involves rights
and obligations that exist independent of the CBA.'" Robinson v.
Nat'l R.R. Passenger Corp., No. CV 19-1881, 2020 WL 4809640, at
*3 (E.D. Pa. Aug. 18, 2020) (quoting Hawaiian Airlines, 512 U.S.
at 260-61)).

This Court has already determined that the RLA did not
preempt Whitmore's § 1981 claim against his union, as pled,
because the claim "[did] not require the Court to interpret
provisions" of the CBA and "involve[d] a right that exists
independently" of that agreement. Order, June 26, 2019, ECF No.
32. The same is true of Whitmore's remaining discrimination and
retaliation claims. Whitmore refers to the CBA as it pertains to
Amtrak's alleged failure to train him and its qualification of
Griffin. However, the essence of his allegations is that Amtrak
discriminated against him by denying him training on the basis
of his race, a claim that does not involve a "controvers[y] over

9

the meaning of an existing collective bargaining agreement in a particular fact situation." See <u>Hawaiian Airlines</u>, 512 U.S. at 252.

While analysis of Whitmore's claims may involve factual disputes about Amtrak's motives, the Court is not required to interpret the CBA to resolve these disputes. See <u>id.</u> at 261 ("'[P]urely factual questions' about an employee's conduct or an employer's conduct and motives do not 'requir[e] a court to interpret any term of a collective-bargaining agreement.'" (second alteration in original) (quoting <u>Lingle v. Norge Div. of Magic Chef, Inc.</u>, 486 U.S. 399, 407 (1988))). Accordingly, Whitmore's claims are not "inextricably intertwined" with the CBA. See <u>Robinson</u>, 2020 WL 4809640, at *4 ("Just because Plaintiff argues that Amtrak's discriminatory conduct restricted his opportunities for overtime, and overtime rules are governed by the CBA, does not mean that Plaintiff's claims are inextricably intertwined with interpreting the CBA such that they are precluded.").

Therefore, the RLA does not preempt Whitmore's claims.

## B.   <u>Discrimination Claims</u>

On the merits, Whitmore alleges Amtrak discriminated against him in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act, and the Pennsylvania Human Relations Act

("PHRA")[3] by denying him training in his transport wagon and PK1 positions on the basis of his race.

Section 1981 provides that all persons "shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. A § 1981 plaintiff "bears the burden of showing that race was a but-for cause of its injury." Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1014 (2020).

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of race, inter alia. Title VII plaintiffs can establish race discrimination by showing that race "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

The parties agree that Whitmore's race discrimination claims require application of the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).

---

[3]     Because discrimination claims brought under Title VII and the PHRA "are governed by essentially the same legal standards," the Court need not analyze the PHRA claim separately. Connelly v. Lane Constr. Corp., 809 F.3d 780, 791 n.8 (3d Cir. 2016) (citing Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3 (3d Cir. 2000)).

The <u>McDonnell Douglas</u> framework proceeds in three steps. First, the plaintiff must establish a prima facie case of racial discrimination. The plaintiff's burden at this stage is "not onerous," as the goal "is to 'eliminate[ ] the most common nondiscriminatory reasons' for the defendant's actions; by doing so, the prima facie case creates an inference that the defendant's actions were discriminatory." <u>Anderson v. Wachovia Mortg. Corp.</u>, 621 F.3d 261, 271 (3d Cir. 2010) (alteration in original) (quoting <u>Tex. Dep't of Cmty. Affs. v. Burdine</u>, 450 U.S. 248, 254 (1981)).

If a plaintiff establishes his prima facie case, "the burden of <u>production</u> shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason'" for the adverse employment action. <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994) (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802). This burden is "relatively light" and is satisfied if the employer provides "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." <u>Id.</u> (citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509 (1993)).

Finally, "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual." <u>Id.</u> To defeat a motion for summary judgment, "the plaintiff must point to some

evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. at 764. Under the burden-shifting framework, "the ultimate burden of proving intentional discrimination always rests with the plaintiff." Id. at 763 (citing Tex. Dep't of Cmty. Affs., 450 U.S. at 253).

### 1. Prima facie case

To establish a prima facie case of racial discrimination, a plaintiff must show that he: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. See Jones, 198 F.3d at 410-11.

As a member of a protected class, Whitmore satisfies the first element of his prima facie case.

Amtrak argues he fails to satisfy the second element—i.e., that he was qualified for his position—because he "failed to demonstrate his proficiency on the Transport Wagon, showing that he clearly was not qualified for a position as a Transit Wagon operator." Def.'s Mot. Summ. J. 25, ECF No. 43-7. This argument begs the question. The crux of Whitmore's discrimination claim is that Amtrak deprived him of the training he needed to retain

13

the position. Construed in the light most favorable to Whitmore, the record indicates that Whitmore, an employee with two decades of experience, was qualified for the trainee positions he held.

Amtrak does not dispute that Whitmore experienced an adverse employment outcome. Whitmore therefore satisfies the third element.

Finally, Amtrak argues Whitmore fails to satisfy the fourth element of the prima facie case because he cannot demonstrate that the circumstances of the adverse employment action give rise to an inference of discrimination. "Common circumstances giving rise to an inference of unlawful discrimination include . . . the more favorable treatment of similarly situated colleagues outside of the relevant class." Bullock v. Child. Hosp. of Phila., 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999). Whitmore satisfies this element of his prima facie case by pointing to the experience of Mark Griffin, his white colleague who was qualified on the PK2 crane. See infra Section V.A.3.

For these reasons, Whitmore has met his burden, which is "not onerous," of establishing a prima facie case of race discrimination. See Anderson, 621 F.3d at 271 (quoting Tex. Dep't of Cmty. Affs., 450 U.S. at 254 (1981)).

### 2.   Legitimate, nondiscriminatory reason

Next, Amtrak points to record evidence supporting a legitimate, non-discriminatory reason for the adverse employment

14

action. Amtrak highlights that Whitmore often attended his sons'
sporting events on the weekends, when the transport wagon was
needed for installations. Wilkins, Whitmore's first trainer on
the transport wagon, reported that Whitmore exhibited a poor
attitude and avoided opportunities to learn all aspects of
operating the wagon. Amtrak also points to Cannon's declaration
that Whitmore refused to cooperate with Cannon's efforts to
train him on the transport wagon and the PK1 crane. Amtrak avers
that Whitmore's "refusal to participate in efforts in training
is a legitimate, non-discriminatory reason for his termination."
Def.'s Mot. Summ. J. 31, ECF No. 43-7.

This evidence, taken as true, permits the conclusion that
Amtrak had a nondiscriminatory reason for the adverse employment
actions. Amtrak therefore satisfies its "relatively light"
burden of production. See Fuentes, 32 F.3d at 763.

3.   Pretext

To demonstrate that an employer's proffered reason is, in
fact, pretextual, a plaintiff "must demonstrate such weaknesses,
implausibilities, inconsistencies, incoherencies, or
contradictions in the employer's proffered legitimate reasons
for its action that a reasonable factfinder could rationally
find them 'unworthy of credence,' and hence infer 'that the
employer did not act for [the asserted] non-discriminatory
reasons.'" Id. at 765 (alteration in original) (first

15

quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d

509, 531 (3d Cir. 1992); then quoting Josey v. John R.

Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)). One way

for a plaintiff to do so is to show "that the employer treated

other, similarly situated persons not of his protected class

more favorably." Id.

Whitmore advances his pretext argument by pointing to (a)

testimony of Amtrak employees that contradicts Amtrak's

contention that Whitmore refused to participate in training and

(b) the experience of Mark Griffin, a white employee whom

Whitmore claims received favorable treatment.

### a)   Testimony of Amtrak employees[4]

Yarin Williams, who worked with Whitmore while Whitmore

held his training positions, testified that he "never noticed

[Whitmore] get any training at all," even though Whitmore was

supposed to receive training in those positions. Williams Dep.

16:12-17:4, ECF No. 46-5. Luis Diaz, who also worked with

Whitmore, testified that Amtrak's description of Whitmore as

unwilling to work on weekends is inaccurate, and that Whitmore

"came out on weekends" and "tried learning the machine," but

---

[4]     Whitmore also points to various statements that constitute inadmissible
opinion testimony by lay witnesses. See Fed. R. Evid. 701. For example, he
highlights testimony by Diaz that the alleged preferential treatment Griffin
received "seemed like it was a racial thing." Diaz Dep. 20:16-21:9, ECF No.
46-6. The Court has excluded inadmissible opinion testimony from its
analysis.

that the machine was difficult to learn without training. Diaz
Dep. 32:3-33:5, ECF No. 46-6.

b)   Comparator evidence

Next, Whitmore points to Griffin, the employee Cannon
qualified on the PK2 crane. Griffin did not hold a training
position, but rather requested to be qualified on the PK2 crane.
According to Whitmore, an Amtrak employee seeking qualification
on a piece of equipment such as the PK2 must first submit a form
requesting a demonstration, and Amtrak typically takes thirty
days to reply to such a request. Whitmore contends that Cannon
qualified Griffin on the PK2 even though Griffin had not
completed training on the machine and did not formally request a
demonstration until the day after he was qualified.

Whitmore argues Griffin is a similarly situated employee
from outside his protected class whom Amtrak treated more
favorably. "To be considered similarly situated, comparator
employees must be similarly situated in all relevant
respects." Wilcher v. Postmaster Gen., 441 F. App'x 879, 882 (3d
Cir. 2011) (first citing Russell v. Univ. of Toledo, 537 F.3d
596 (6th Cir. 2008); then citing Lee v. Kan. City S. Ry.
Co., 574 F.3d 253, 259-61 (5th Cir. 2009)). "A determination of
whether employees are similarly situated takes into account
factors such as the employees' job responsibilities, the
supervisors and decision-makers, and the nature of the

misconduct engaged in." Id. (first citing Lee, 574 F.3d at 259–61; then citing Burks v. Wis. Dep't of Transp., 464 F.3d 744 (7th Cir. 2006)).

Amtrak argues Griffin is an inappropriate comparator because he did not "hold the same position" as Whitmore and was not "subject to the same circumstances." Def.'s Mot. Summ. J. 28, ECF No. 43-7 (quoting Danao v. ABM Janitorial Servs., 142 F. Supp. 3d 363, 375 (E.D. Pa. 2015)). In support of this argument, Amtrak highlights that Whitmore "was in training on a different machine than the machine Mr. Griffin was ultimately qualified on" and that "unlike Mr. Whitmore, Mr. Griffin was not in a training position." Id.

Amtrak also highlights that Cannon qualified an African American employee, Ryan Wilkins, on the PK2 crane and that Wilkins, like Griffin, was not in a training position prior to his qualification, but instead submitted a Request to Demonstrate. Amtrak argues Whitmore "cannot selectively choose a comparator." Def.'s Reply Supp. Mot. Summ. J. 8, ECF No. 47-1 (quoting Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998)).

While Amtrak is free to pursue this argument before the factfinder, there is insufficient record evidence for the Court to determine whether Ryan Wilkins's qualification process undermines Griffin's appropriateness as a comparator. Neither

18

party points to record evidence about how Wilkins's background
and training compare to Griffin's, or about whether Wilkins
submitted a Request to Demonstrate before his qualification exam
or, like Griffin, whether he did so after his demonstration.

On the record before the Court, a reasonable jury could
find Whitmore and Griffin to be similarly situated in all
relevant aspects. Although Griffin was qualified on the PK2, as
opposed to the PK1, Amtrak describes the cranes as "similar."
Def.'s Mot. Summ. J. 28, ECF No. 43-7. The two men were members
of the same crew, and Griffin was qualified by Cannon, who was
Whitmore's assigned trainer. Contrary to Amtrak's assertion, the
fact that Griffin did not hold a training position does not
necessarily render him an inappropriate comparator, as
Whitmore's theory of the case is that Griffin's qualification
without sufficient training and documentation evinces
discrimination.

A reasonable jury could also conclude that Amtrak's
treatment of Griffin, when compared to its treatment of
Whitmore, demonstrates "such weaknesses, implausibilities,
inconsistencies, incoherencies, or contradictions in the
employer's proffered legitimate reasons" as to find those
reasons "unworthy of credence." Fuentes v. Perskie, 32 F.3d 759,
765 (3d Cir. 1994) (first quoting Ezold v. Wolf, Block, Schorr &
Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992); then quoting

Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir.
1993)). Whitmore testified that while his own demonstrations on
the transport wagon were cancelled multiple times, McFarland and
Cannon qualified Griffin on the PK2 crane even though Griffin
had not filed a Request to Demonstrate prior to his
demonstration. He also testified that while he did not receive
proper training even after complaining to McFarland and the
Amtrak Helpline, "the training and qualification process were
upended and made a mockery of so that . . . Griffin could be
qualified on a machine that he had never been trained on." Pl.'s
Br. Opp'n Def.'s Mot. Summ. J. 21, ECF No. 46.[5]

Additionally, Whitmore's colleague Yarin Williams described
Griffin's qualification on the PK2 machine as "shocking" because
"people bid these jobs and it's a process based off seniority
and it's not something that you can just walk right in and get
qualified on." Williams Dep. 23:13-25:10, ECF No. 46-5. He
testified that he knew "several people in the gang that actually

---

[5]     Amtrak argues that Whitmore's focus on McFarland is misplaced because
Whitmore "has provided no admissible evidence to support his conclusion that
Mr. McFarland made the decisions to eliminate the training positions." Def.'s
Reply Supp. Mot. Summ. J. 10, ECF No. 47-1. According to Amtrak, Training
Department Management Lead Frank Kruse, who is of American Indian and Alaska
Native descent, made the decision to remove Whitmore from his transport wagon
position, and Manager of Engineering Production Anthony Civil, who is African
American, terminated the PK1 position. See supra Part II.
        However, Whitmore argues that McFarland, who is white, controlled who
received training, and that Whitmore was unable to remain in his training
positions because McFarland prevented him from receiving the necessary
training on the basis of his race. The Court need not determine at this stage
of the litigation whether the decisions to terminate the training positions
should be imputed to Kruse, Civil, and/or McFarland, as Amtrak is liable for
the alleged discrimination under each of these scenarios.

spent months, . . . even a year or two and they didn't get qualified on it." Id. In contrast, Griffin was qualified "overnight." Id. Luis Diaz echoed this sentiment, testifying that Diaz "was in the gang longer than [Griffin] and [Griffin] got qualified . . . overnight." Diaz Dep. 21:4-8, ECF No. 46-6.

In sum, the evidence to which Whitmore points could cause a factfinder to "reasonably either (1) disbelieve [Amtrak's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Amtrak's] action." Fuentes, 32 F.3d at 764. Under these circumstances, a reasonable jury could find that Amtrak discriminated against Whitmore by denying him training in his transport wagon and PK1 positions on the basis of his race.

Accordingly, Amtrak is not entitled to summary judgment on Whitmore's race discrimination claims.

### C.   **Hostile Work Environment Claims**

Whitmore also alleges Amtrak violated Title VII and the PHRA by maintaining a hostile work environment.

A plaintiff bringing a Title VII hostile work environment claim must show that the workplace at issue was "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

21

environment.'" Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). To establish such a claim, a plaintiff must show: "1) the employee suffered intentional discrimination [because of his membership in a protected class], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability." Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013).

When determining whether a plaintiff has established these elements, courts must evaluate the record "as a whole," concentrating "not on individual incidents, but on the overall scenario." Cardenas v. Massey, 269 F.3d 251, 261 (3d Cir. 2001) (quoting Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999)). "'[O]ffhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). Further, a plaintiff cannot meet the causation element of a hostile work environment claim "solely by pointing to comments that were directed at other individuals," as he "cannot show that the comments would not

have been uttered or written but for <u>his</u> race if [he] was
neither on the receiving end nor the subject of any comments."
<u>Id.</u>

In support of his hostile work environment claim, Whitmore
points the Court, in general terms, to his own testimony, as
well as that of other Amtrak employees. Whitmore testified that
white coworkers referred to the concrete tie gang of which he
was a member as the "black gang." Whitmore Dep. 314:12-315:8,
ECF No. 46-3. However, he also testified that he has never been
called a racially derogatory term by anyone at Amtrak, nor has
he ever heard of a white employee referring to him using a
racially derogatory word.

Maurice Robinson testified that Frank Kruse, the Training
Department Management Lead who abolished Whitmore's transport
wagon position, made racist comments about him and other African
American employees. Robinson Dep. 135:2-138:23, ECF No. 46-7.
Yarin Williams testified that he heard of a white employee
referring to an African American coworker using the "N" word.
Williams Dep. 26:14-27:10, ECF No. 46-5. Williams testified that
Whitmore "may have witnessed" that statement, as Whitmore was in
the gang where it was allegedly made. <u>Id.</u>

The evidence to which Whitmore points is insufficient to
establish a hostile work environment claim. The isolated
incidents he highlights are insufficient to show that the

23

challenged conduct was "severe or pervasive." See Phillips v. SEPTA, No. CV 16-0986, 2018 WL 827440, at *6 (E.D. Pa. Feb. 12, 2018) (Robreno, J.) (collecting cases). Further, all but perhaps one of the comments he highlights were directed at other individuals. See Caver, 420 F.3d at 262. Therefore, his hostile work environment claims under Title VII and the PHRA fail as a matter of law.

For the foregoing reasons, Amtrak is entitled to summary judgment on Whitmore's hostile work environment claims.

### D.   **Retaliation**

Under Title VII, it is unlawful for an employer to discriminate against any employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A plaintiff in a Title VII retaliation action "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013).

In the absence of direct evidence, courts analyze Title VII retaliation cases under the McDonnell Douglas burden-shifting framework. See supra Section V.A.; see also Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006).

To establish a prima facie case of retaliation in violation of Title VII, a plaintiff must demonstrate that "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Moore, 461 F.3d at 340-41 (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)).

Even assuming, arguendo, that Whitmore has established a prima facie case of retaliation, his case fails at the final stage of the McDonnell Douglas analysis. To survive summary judgment in a pretext case, "the plaintiff must produce 'sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action.'" Krouse v. Am. Sterilizer Co., 126 F.3d 494, 504 (3d Cir. 1997) (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996)). As with claims of racial discrimination, see supra Section V.A, a plaintiff in a retaliation action can demonstrate pretext by exposing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" Marra v. Phila. Hous. Auth.,

497 F.3d 286, 306 (3d Cir. 2007) (quoting Krouse, 126 F.3d at 504).

Whitmore fails to produce sufficient evidence to survive summary judgment on his retaliation claims. While he contends that his "complaints and reports of discrimination were referenced and acknowledged by superiors who retaliated against him," the only specific evidence he cites in support of his retaliation claim is his April 2016 encounter with McFarland in which McFarland allegedly attempted to close his car window on Whitmore's hand and told him to "get a lawyer." See Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 26, ECF No. 46.

While "temporal proximity" between the protected activity and the adverse employment outcome can, under some circumstances, suffice to establish a causal link, "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 n.9 (3d Cir. 2003) (quoting Krouse, 126 F.3d at 503). In this case, the protected activity (i.e., Whitmore's December 2015 Amtrak Helpline call in which he complained of national origin discrimination), occurred more than a year before he was terminated from his first training position. The interaction with McFarland to which he points, and his Helpline complaint about that interaction, occurred eleven months before he lost

26

his position. This evidence is insufficient to establish a causal connection between Whitmore's protected activity and his adverse employment outcome. See id. Whitmore fails to point to additional record evidence that would permit a reasonable factfinder to conclude that his protected activity "was a but-for cause of the alleged adverse action" by Amtrak. See Nassar, 570 U.S. at 362.

Accordingly, Amtrak is entitled to summary judgment on Whitmore's retaliation claim.

**V.    CONCLUSION**

For the foregoing reasons, the Court will (1) deny Amtrak's motion for summary judgment on Whitmore's race discrimination claims and (2) grant the motion with respect to his hostile work environment claims and retaliation claims. An appropriate order will issue.